

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00511-CV

**IN THE INTEREST OF J.A.G.** and G.A.G., Children

From the 45th Judicial District Court, Bexar County, Texas
Trial Court No. 2023-PA-00934
Honorable Charles E. Montemayor, Associate Judge Presiding

Opinion by:    Rebeca C. Martinez, Chief Justice

Sitting:    Rebeca C. Martinez, Chief Justice
Adrian A. Spears II, Justice
H. Todd McCray, Justice

Delivered and Filed: January 15, 2025

AFFIRMED

This is an accelerated appeal from an order terminating the parental rights of appellant, S.E.G. ("Mother"), to her children, J.A.G. and G.A.G.[1]  In her first four of six issues, Mother challenges the sufficiency of the evidence to support the trial court's findings underlying the termination decision.  In her fifth issue, Mother contends the trial court abused its discretion by appointing a nonparent as managing conservator.  In her sixth issue, Mother contends the trial court erred by relying on material outside of the trial record.  We affirm.

---

[1] To protect the identities of the minor children in this appeal, we refer to the children and Mother by their initials.  *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

BACKGROUND

On June 21, 2023, the Texas Department of Family and Protective Services (the "Department") filed a petition to terminate the parental rights of Mother and the presumed father to the children. The trial court held a bench trial beginning on May 31, 2024. At that time, the children — twin boys — were two years and nine months old.

On the first day of trial, the parties and the trial court discussed matters related to the production of discovery. In the course of this discussion, counsel for the Department referenced a prior parental-termination case involving Mother, and the trial court referenced prior hearings in the instant case. The trial court noted that the judge's notes from the full adversary hearing, held on July 3, 2023, listed a "Roadmap to Reunification." *See* TEX. FAM. CODE ANN. § 262.201(a) (requiring full adversary hearing within fourteen days after child is taken into possession by Department). The trial court explained that in its roadmap it laid out three requirements for Mother's reunification with her children: (1) completion of "intense domestic violence" classes, (2) zero tolerance regarding drug testing, and (3) "intense therapy." The trial court further noted that it reiterated its three-prong roadmap at subsequent hearings.

After this discussion, the Department called the first of its two caseworkers to testify. First to testify was Jessica McCada, Mother's caseworker from the start of the case until March 1, 2024. McCada testified that the children came into the Department's care in July 2023, and that the Department became involved because of "neglectful supervision and substance abuse." Beyond these sparse statements, McCada gave no details regarding removal. On cross-examination, McCada confirmed that any domestic violence between Mother and the children's father occurred over a year before trial and that Mother never indicated she had suffered domestic violence during the course of the case. Additionally, the caseworker referenced two "disturbance calls" at Mother's

apartment complex in July and November 2023, but McCada gave no details about the calls. The balance of McCada's testimony concerned Mother and the children during the pendency of the case. Because this testimony comprised the majority of the trial evidence, we recount these matters in some detail.

McCada testified that the Department created a service plan for Mother, which McCada reviewed with Mother and which Mother signed. The clerk's record contains a service plan, but it is not signed by Mother. This plan lists 5 required actions:

- [Mother] shall obtain and maintain appropriate housing and show proof with a lease or contract. [Mother] shall obtain legal employment and show proof through paystubs or a letter from the owner or main office of employer. [Mother] shall update the [D]epartment of any changes to her housing or employment status.

- [Mother] shall attend and participate in the classroom to address family violence.[2]

- [Mother] is required to remain drug and alcohol free twenty-four (24) hours a day, seven (7) days a week and three hundred sixty-five (365) days a year. [Mother] is required to comply with all random drug testing. [Mother] must be negative on all tests to demonstrate that she can live a drug/alcohol free lifestyle. Refusal to test, not showing up for a test, or inability to take the test for any reason will be considered a POSITIVE result. . . . [Mother] is required to provide the caseworker with a valid prescription for any prescription medications she is taking.

- [Mother] will participate in individual counseling services. She will follow any recommendations provided by the therapist. [Mother] will be able to demonstrate what she has learned from h[er] sessions with her child[ren]. [Mother] will address any mental health concerns and utilize techniques learned through therapy. [Mother] will attend all scheduled appointments and work towards reunification, per therapeutic recommendation. . . . She will learn positive coping skills that will help her be [a] safe parent[]. Any concerns and/or issues revealed through psychosocial evaluations or that arise during therapy will also be addressed. She will also be responsible for following through with all recommendations made by her respective therapists.

- [Mother] will stay away from [the children's father] and build a healthy relationship for her children and herself. [Mother] shall maintain contact with the Department on at least a monthly basis and allow announced and unannounced access to her home.

---

[2] The plan lists additional requirements related to domestic violence, but because the Department does not dispute that Mother completed her services related to domestic violence, we do not list them.

On August 18, 2023, the trial court held a status hearing, and, following the hearing, issued a "Status Hearing Order." That order approves Mother's service plan and makes it an order of the court by incorporation into the Status Hearing Order. The Status Hearing Order also states that Mother attended the August 18, 2023 hearing, and it states: "The Court advises the parents that progress under the service plan will be reviewed at all subsequent hearings, including a review of whether the parties have acquired or learned any specific skills or knowledge stated in the service plan."

On December 27, 2023, the trial court signed another order following a status hearing. The December 27, 2023 order states that Mother appeared in person at the status hearing, and it states a finding that Mother "**has not** demonstrated adequate and appropriate compliance with the service plan." Further, the order states, "[E]xcept as specifically modified by this order or any subsequent order, the plan of service for the parents, previously filed with the Court and incorporated herein by reference as if the same were copied verbatim in this order, is APPROVED and made an ORDER of the Court." Likewise, on March 25, 2024, the trial court signed another order following a status hearing that (1) notes Mother's appearance, (2) finds Mother had not demonstrated adequate compliance with her service plan, and (3) makes Mother's service plan an order of the court.

McCada testified at trial that the Department asked Mother to do "[i]ntense therapy, domestic violence, and drug tests." As to therapy, McCada testified that Mother engaged in therapy but did not successfully complete therapy. McCada stated that Mother "went from one therapist to another therapist throughout the case," and McCada believed Mother had seen two therapists in total. According to McCada, Mother's last therapist was no longer seeing her because, "I think it was a scheduling conflict. And I think that her insurance might not have taken it

anymore." However, McCada also testified that the Department had a therapist that Mother engaged with and that, "She's still enrolled in therapy." On cross-examination, McCada confirmed that Mother continued to engage in "intense therapy," and that Mother had expressed a desire to continue "working services." Even though McCada stepped down as Mother's caseworker on March 1, 2023, she stated that she had knowledge of Mother's present circumstances because she had spoken with the current caseworker. McCada also testified that she had not received any therapy notes, but the other caseworker had talked to Mother's therapist.

Next, McCada testified that Mother stayed in contact with the Department and completed her required services related to domestic violence. As to drug testing, McCada testified that Mother took a drug assessment, and the recommendation was for Mother "to continue the drug test substance abuse program," which Mother was attending. McCada testified that the Department asked Mother to drug test at least twice per month, but Mother missed "a number of them." According to McCada, the reasons Mother gave for her missed tests were:

> In the beginning, she said it was because she was going to the hospital and going to doctors' appointments. But when asked to provide evidence, there was one document that didn't line up with when the request was.

> And then she said she couldn't go because of work, but it was a late notice. There was a lot of times where she just didn't respond back and said she didn't see my message. I sent them out every morning at 8 o'clock, sometimes 9 o'clock, but she had eight hours to drug test.

On the second day of trial, the trial court admitted documents showing results from Mother's drug tests. These documents provide context for the caseworkers' testimony. The documents reflect Mother's positive tests for methamphetamine based on urine samples Mother provided on August 23, 2023, December 15, 2023, and February 2, 2024. The documents also show positive test results for heroin based on urine samples Mother provided on April 18, 2024, and April 23, 2024.

McCada testified that Mother's response regarding the methamphetamine positive test results was "there's no way." Later, Mother suggested to McCada that her medication for high blood pressure could have caused the positive results. McCada informed Mother that she would need to discuss the matter with the testing facility. According to McCada, Mother never admitted to drug use.

Regarding employment and housing, Mother told McCada she was employed but never provided paystubs or other proof of employment. McCada testified that Mother was evicted from her apartment at the end of February 2024, and after eviction, Mother lived in multiple hotels.

Regarding the children, McCada testified that both children are autistic, that G.A.G. is nonverbal, and that J.A.G. is "more high functioning" than his brother. Both children received physical therapy and occupational therapy, and G.A.G. additionally received speech therapy. During the case, Mother was allowed weekly, two-hour visits with the children. McCada testified that the visits were appropriate, and the boys "are bonded with [Mother], but they're also — [G.A.G.] kinda keeps to himself and does his own thing. And [J.A.G.] is kind of — is more of a mamma's boy and kind of connects to her." McCada testified that Mother never provided "in-kind" support to the children, other than snacks and toys at visits. After removal, the children were placed in foster care. According to McCada, the foster placement was able to meet the children's physical and emotional needs, including ensuring the children attend their medical appointments. McCada also testified, "They have expressed that they will keep the children until they are adopted," and that the children are bonded with "their foster placement." However, McCada gave few additional details about foster care. Further, McCada testified that the Department was actively seeking a permanent placement for the children. According to McCada, Mother had not

provided the names of any family members who could be potential placements. Mother offered the name of a friend, but later withdrew the name because the friend "wasn't stable herself."

Mother's caseworker at the time of trial, Ashley Herring, who had taken over on March 1, 2024, testified next. Herring confirmed that Mother completed her domestic violence program, and was attending therapy. According to Herring, Mother was self-employed as a bookkeeper, and Mother showed Herring receipts for cash payments for work she had performed. Herring believed Mother would be able to support herself and the boys if she had more consistent work. At the time of trial, Mother lived in a hotel that offered long-term stays, and she paid weekly for a room. Mother had lived in the same room since Herring had become the caseworker. Herring testified that the hotel was an appropriate residence for the children, so long as Mother moved into a larger unit if the boys were returned to her care. Herring believed Mother had a stable residence.

Herring, however, did not believe Mother could meet the children's emotional and physical needs because of "the people she's surrounding herself with." According to Herring, Mother was "surrounding herself with people who engage in drug use." Mother told Herring, "that her test came out positive due to her helping her friend, who is addicted to heroin[], clean up." According to Herring, Mother contended that her positive heroin tests resulted from "exposure," not use. Additionally, Herring testified,"[Mother]'s the one who's indicated to me that [her friends] were addicted to heroin[]." Herring sent Mother to drug test eight times, and once Mother refused a hair follicle test. Herring testified that Mother stated she was not taking her blood-pressure medication as prescribed because she believed it caused her positive methamphetamine test results. Herring confirmed that the children's medical and psychological needs were being met at their current placement and believed a permanent placement could be found.

Last, Jennifer Breaden, one of the court appointed special advocates ("CASA"), testified. Breaden and her husband were appointed as CASAs in August 2023, and visited the children once a month. Breaden confirmed that Mother "has a very strong bond with the twins," but Breaden recommended the termination of Mother's parental rights due to "ongoing positive drug tests," "instability with housing," and "instability with income."

The trial court scheduled a second day of trial after Mother's counsel indicated that he would call an expert to testify "regarding the issue of the causation of positive drug test results." However, on the second day of trial, held on July 1, 2024, the parties rested without calling additional witnesses. The only additional evidence adduced were documents reflecting Mother's drug test results, which were admitted as business records.

The parties then gave closing arguments. Before announcing its ruling, the trial court stated:

> This is a case where [t]he Department, the Guardian Attorney Ad Litem, and CASA are all recommending termination. And these cases are tried not in two days, but in this case, almost a period of a year to the date. The 262 regarding these twins was held on July 3rd, 2023. We're now July 1st, 2024.
>
> The case and the parties have a long, long, very, very long history with [t]he Department. And it's well documented. And even with a trial, it's only been touched on briefly, but the history is long and very, very clear.
>
> . . .
>
> And the road map to reunification referenced by attorney for the mother, frankly, referenced in testimony, and even my own rulings throughout the case, deals with the knowledge of that history.
>
> . . .
>
> . . . [W]hile we were on a monitored return in 2020-PA-[XXXXX], there were incidents of disruption and chaos, which happen in the lives, as [counsel] indicated, with histories as these parents do.

The trial court continued its remarks, discussing events from the prior case as well as matters raised in prior hearings in the instant case. After it concluded its remarks, the trial court announced that it would terminate Mother's parental rights.

On July 29, 2024, the trial court signed an order of termination, finding Mother constructively abandoned the children, *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(N), failed to comply with the provisions of a court order that specifically established the actions necessary for the return of the children, *see id.* § 161.001(b)(1)(O), and used a controlled substance and failed to complete a court-ordered substance abuse treatment program or after completion of such program, continued to use a controlled substance, *see id.* § 161.001(b)(1)(P). The trial court also found that termination of Mother's parental rights was in the children's best interest. *See id.* § 161.001(b)(2). Mother timely appeals.[3]

### STANDARD OF REVIEW

A parent-child relationship may be terminated, pursuant to section 161.001 of the Texas Family Code, only if the trial court finds by clear and convincing evidence one of the predicate grounds enumerated in subsection (b)(1) and that termination is in a child's best interest. *See id.* § 161.001(b)(1), (2). Clear and convincing evidence requires "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

"This heightened burden of proof affects the standard of review in an evidentiary challenge on appeal." *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022). In reviewing a legal-sufficiency challenge:

> [A] court should look at all the evidence in the light most favorable to the finding
> to determine whether a reasonable trier of fact could have formed a firm belief or

---

[3] The order also terminates the parental rights of M.A.G., the father of J.A.G. and G.A.G. M.A.G. does not appeal, and he is not a party to this appeal.

conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard *all* evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient.

*In re J.O.A.*, 283 S.W.3d 336, 344–45 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). Only when the factual sufficiency of the evidence is challenged, is disputed or conflicting evidence under review. *Id.* at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266).

### COMPETENT EVIDENCE

We begin with Mother's sixth issue because it concerns the evidence that we may consider in our legal and factual sufficiency reviews of the trial court's findings. Mother contends the trial court erred by relying on its notes from prior hearings and prior cases because such information "was not presented through evidence at trial or varied from the trial evidence."

In general, "during a sufficiency review on appeal, we are not permitted to consider factual statements or allegations that were not admitted during a final hearing." *In re J.B.*, No. 11-22-00305-CV, 2023 WL 3213089, at *4 (Tex. App.—Eastland May 3, 2023, no pet.). "In order for testimony at a prior hearing or trial to be considered at a subsequent proceeding, the transcript of that testimony must be properly authenticated and entered into evidence." *In re E.J.C.*, No. 04-

23-00519-CV, 2023 WL 7367772, at *3 (Tex. App.—San Antonio Nov. 8, 2023, no pet.) (quoting *In re J.B.*, 2023 WL 3213089, at *4). Additionally, while a trial court may take judicial notice of the contents of its records, it may not take judicial notice of the *truth* of any allegations in its records, including allegations by the caseworker in the family service plan, any affidavits, or CASA reports. *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *1 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied); *In re J.E.H.*, 384 S.W.3d 864, 870 (Tex. App.—San Antonio 2012, no pet.); *see also Camp Mystic, Inc. v. Eastland*, 399 S.W.3d 266, 278 (Tex. App.—San Antonio 2012, no pet.) ("[T]he trial court cannot take judicial notice of testimony from a previous proceeding at a subsequent proceeding unless the testimony is admitted into evidence at the subsequent proceeding.").

Therefore, we agree with Mother that it was error for the trial court to have considered facts developed at a final termination hearing in another case or at prior hearings in the instant case when no transcripts or other materials from the prior proceedings were admitted into evidence at the termination hearing in this case. *See In re E.J.C.*, 2023 WL 7367772, at *3; *Camp Mystic, Inc.*, 399 S.W.3d at 278; *see also In re J.C.R.*, No. 04-18-00949-CV, 2019 WL 2110109, at *2 n.2 (Tex. App.—San Antonio May 15, 2019, pet. denied) (urging trial court and parties "to spend more time on the development of evidence at trial"). Accordingly, our sufficiency reviews that follow are limited to the testimony presented and exhibits admitted at the final hearing in this case. *See In re E.J.C.*, 2023 WL 7367772, at *3; *see also In re R.S.D.*, 446 S.W.3d 816, 820 n.4 (Tex. App.—San Antonio 2014, no pet.) ("[W]e are limited to reviewing only the evidence admitted at the termination hearing."). In addition, we consider the orders filed in the trial court that are contained within the clerk's record because the trial court could properly take judicial notice of the contents of its record; however, we do not accept as true any allegations stated in the documents filed in the

trial court. *See In re J.E.H.*, 384 S.W.3d at 870 ("[T]he trial court could properly take judicial notice that it signed an order adopting the family service plan and what the plan listed as the necessary requirements [father] was required to complete before [his child] would be returned to him.").[4]

Next, before proceeding with our sufficiency reviews, we must resolve a specific evidentiary complaint Mother asserts on appeal, which she incorporates into several of her issues. Mother contends that the drug test results admitted at trial are not competent evidence that could support the termination findings.

At trial, the Department moved to admit two exhibits, both of which included an affidavit from a custodian of records and drug test results. Mother's counsel objected, and the following discussion ensued:

> [MOTHER'S COUNSEL]: The objection now is that she — they don't have an expert to testify as to the results. They can —
>
> THE COURT: So you can't have it both ways, [counsel]. Either we accept the business records affidavit as offered, that's great, or you're going to contest the validity of it. In which case, he's allowed to call his witness as a rebuttal.[5] So it's either way.
>
> [MOTHER'S COUNSEL]: But that's what I was going to say. Accept the records as documents kept as business records. But as to the authenticity and the reliability of information therein, I think you need an expert to prove that.
>
> THE COURT: Well, they speak for themselves. They'll be attributed as to the weight. But as far as admissibility, they're admitted. As to the weight, they're offered for what they say. And you can cross-examine that if you wish to question the validity. But if you do that, you may be slamming a door wide open, but we'll see.

---

[4] We may presume the trial court took judicial notice of its records, even without any request having been made or announcement in the record that it had done so. *See In re J.E.H.*, 384 S.W.3d 864, 870 (Tex. App.—San Antonio 2012, no pet.).

[5] Prior to making this statement, the trial court had excluded the Department's expert witness on drug testing based upon the untimely disclosure of the expert.

On appeal, Mother asserts regarding the trial objection: "Appellant's counsel didn't object as to [the exhibits] admission solely as business records, but did object to the Department's lack of required expert testimony regarding the reliability of information therein."  In support of her argument, Mother cites only Texas Rule of Evidence 803(6) and *In re K.C.P.*, 142 S.W.3d 574 (Tex. App.—Texarkana 2004, no pet.).

Texas Rule of Evidence 803(6) allows, as an exception to the rule against hearsay, the admission of records kept in the course of regularly conducted business activities.  TEX. R. EVID. 803(6); *see In re K.C.P.*, 142 S.W.3d at 578.  For admission of evidence under this rule, the proponent must prove that the document was made at or near the time of the events recorded, from information transmitted by a person with knowledge of the events, and made or kept in the course of a regularly conducted business activity, unless the opponent demonstrates the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.  TEX. R. EVID. 803(6); *see In re K.C.P.*, 142 S.W.3d at 578.  The predicate for admission of a business record may be established by an affidavit that complies with Texas Rule of Evidence 902(10).  TEX. R. EVID. 902(10); *see In re K.C.P.*, 142 S.W.3d at 578.

Here, the affidavits are in the form provided by Rule 902(10), and Mother does not contend otherwise.  "Because the test results were accompanied by affidavits that complied with Rule of Evidence 902(10)(B), 'the only question' regarding admissibility was 'whether the drug test result[s] showed sufficient indicia of trustworthiness' to bring them within the business-records exception to the hearsay rule."  *In re S.W.W.*, No. 14-22-00503-CV, 2022 WL 17982904, at *7 (Tex. App.—Houston [14th Dist.] Dec. 29, 2022, pet. denied) (mem. op.) (quoting *F.C. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-19-00625-CV, 2020 WL 101998, at *6 (Tex. App.—Austin Jan. 9, 2020, no pet.) (mem. op.)).  In fact, Rule 803(6) allows admission, unless "the

opponent fails to demonstrate that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." TEX. R. EVID. 803(6)(E).

If Mother contends the business records are untrustworthy because they lack expert testimony regarding reliability, she must object to their admission on that ground, and not, as she has done here, concede to admission. *See* TEX. R. EVID. 803(6)(E); *In re S.W.W.*, 2022 WL 17982904, at *7. For this reason alone, *In re K.C.P.* is distinguishable because, there, the parents' attorneys objected to admission of exhibits reflecting drug test results as business records under Rule 803(6). *See In re K.C.P.*, 142 S.W.3d at 578–79.

To the extent Mother complains that an expert witness was required to interpret the drug test results once admitted, she has provided no authority in support of this contention, and we reject it as inadequately briefed. *See* TEX. R. APP. P. 38.1(i) (requiring appellant's brief to contain appropriate citations to authorities); *cf. In re Z.N.M.*, No. 14-17-00650-CV, 2018 WL 358480, at *6 (Tex. App.—Houston [14th Dist.] Jan. 11, 2018, no pet.) ("Father cites no authority requiring expert testimony to interpret drug test results in parental termination cases. This court has considered this argument before and rejected it."). To the extent Mother argues admission of the test results required live testimony of an expert witness "as to the authenticity and the reliability of information therein," she likewise has provided no authority in support of this contention, and we reject it as inadequately briefed. *See* TEX. R. APP. P. 38.1(i); *cf. In re E.B.*, No. 11-19-00001-CV, 2019 WL 3955974, at *3 (Tex. App.—Eastland Aug. 22, 2019, no pet.) (mem. op.) (rejecting appellant's argument that drug tests admitted as business-records required live testimony of expert witness as to authenticity of test, process, and equipment used). Accordingly, we consider as competent evidence the Department's exhibits showing Mother's drug test results in our following sufficiency analysis.

**PREDICATE GROUND**

In her first three issues, Mother contends the evidence is legally and factually insufficient to support the trial court's findings as to the predicate grounds (N), (O), and (P). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N), (O), (P). We consider only Mother's second issue concerning predicate ground (O) because clear and convincing evidence support the trial court's finding as to this predicate ground and only one predicate finding is necessary when there is also a finding that termination is in a child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *see also In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (per curiam).

Parental rights may be terminated under subsection (O) if the Department establishes by clear and convincing evidence that the parent

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for abuse or neglect of the child[.]

TEX. FAM. CODE ANN. § 161.001(b)(1)(O). However, section 161.001(d) precludes termination "if a parent proves by a preponderance of the evidence that: (1) the parent was unable to comply with specific provisions of the court order; and (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent." *Id.* § 161.001(d).

Subsection (O) "authorizes termination for failure to comply with a service plan 'only when that plan requires the parent to perform specific actions.'" *In re R.J.G.*, 681 S.W.3d 370, 378–79 (Tex. 2023) (quoting *In re A.L.R.*, 646 S.W.3d 833, 838 (Tex. 2022) (per curiam)). Subsection (O) cannot be proven by clear and convincing evidence if based on a plan that is unwritten or one that is written but vague. *Id.* at 373. Evaluating plan compliance "necessarily requires a nuanced

assessment of the parent's conduct and progress toward plan completion in light of the totality of the plan's requirements and overall goal." *Id.* at 381. Moreover, "termination is not automatic or required, even if the Department properly proves a parent failed to comply with a specific plan provision." *Id.* at 379. "[T]he trial court bears the ultimate responsibility for determining whether that finding supports termination." *Id.* Therefore, it is only the violation of "material" requirements of a plan that justify termination under subsection (O). *Id.* "[I]f the noncompliance is trivial or immaterial in light of the plan's requirements overall, termination under (O) is not appropriate." *Id.*

Mother argues that her plan was confusing based on the inconsistency between the written family service plan and the "Roadmap to Reunification" announced by the trial court. Mother further argues that she completed the three prongs of the roadmap.

We disagree that there could be any confusion as to Mother's court ordered service plan. Mother's family service plan was written and incorporated into three court orders. Each court ordered states that Mother was present at the hearing leading to the order, and the first order includes a statement that the court will review compliance with the plan at subsequent hearings. Even though Mother did not sign the service plan contained in the clerk's record, the Family Code explicitly contemplates the adoption of a service plan when a parent is unable or unwilling to participate in the development of the plan or to sign the plan. *See* TEX. FAM. CODE ANN. § 263.103(a) ("If a parent is not able or willing to participate in the development of the service plan, it should be so noted in the plan."); *id.* § 263.103(c) ("If the [D]epartment determines that the child's parents are unable or unwilling to participate in the development of the original service plan or sign the plan, the [D]epartment may file the plan without the parents' signatures."); *see also id.* § 263.103(d)(2) (noting that service plan takes effect when parties sign the plan or "the

court issues an order giving effect to the plan without the parents' signatures"). In fact, were we to rely on the unwritten "Roadmap to Reunification" we would run afoul of the supreme court's pronouncement that subsection (O) requires a written plan. *See In re R.J.G.*, 681 S.W.3d at 373.

Nevertheless, the "Roadmap to Reunification" may be useful to direct us to the material elements of the plan and the elements the trial court relied upon when ordering termination. *See Id.* at 379. The roadmap elements are also consistent with the written plan: each requires domestic violence classes, therapy, and drug testing and abstinence. Mother does not contend that these elements are immaterial. *See In re Z.R.E.B.*, No. 11-23-00233-CV, 2024 WL 968965, at *4 (Tex. App.—Eastland Mar. 7, 2024, no pet.) (mem. op.) ("Drug and alcohol restrictions are material service plan requirements[.]"). Instead, she contends that the evidence shows her compliance or a valid excuse for noncompliance as to each of these elements. No party disputes Mother's compliance with the domestic-violence element of her service plan, and the record suggests Mother's substantial compliance with the individual-therapy element of her plan.

However, the evidence is legally and factually sufficient to establish Mother's failure to comply with the drug-testing and -abstinence element of her plan, and this noncompliance of a material element fully supports the subsection (O) finding. "[N]ot all service plan requirements are created equal, and strict compliance with every aspect of every plan requirement is not always the standard." *In re R.J.G.*, 681 S.W.3d at 382. But,

> [t]here may be provisions in particular service plans for which nothing less than strict compliance will suffice to avoid termination. Easy examples are provisions that require a parent suffering from drug addiction to complete a drug treatment program or require a parent just released from prison to refrain from re-offending. Even a single or slight violation of these or other material service plan provisions *could* justify termination.

*Id.* Even if we disregard the judge's notes and the trial court's statements before and after testimony concerning "zero tolerance regarding drug testing," the record shows that drug abuse

was a focus of the case and that Mother failed to comply with drug testing and abstinence. This case began in June 2023, and the record shows that Mother tested positive for methamphetamine in August 2023, December 2023, and February 2024. Meanwhile in December 2023 and March 2024, the trial court noted Mother's noncompliance with her service plan in status hearing orders. Mother continued to test positive for illegal drugs when, in April 2024, she tested positive twice for heroin. Mother's service plan not only demanded that she remain drug free, but also required her to submit to drug tests. The plan stated that any refusal to test would be considered a positive result. Nevertheless, McCada testified that Mother missed "a number of them," and according to Herring, Mother refused to comply with Herring's request for a hair-follicle drug test. The record does not indicate that Mother offered any explanation for her refusal to provide a hair-follicle sample, and Mother's contention that prescription medication caused positive results applied only to her positive results for methamphetamine. *See* TEX. FAM. CODE ANN. § 161.001(d).

We hold the trial court's subsection (O) requirement is supported by legally and factually sufficient evidence. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O). The evidence shows a wide departure from the service plan's drug-testing and -abstinence requirements, which were material to the plan. *See In re K.D.*, No. 05-23-01056-CV, 2024 WL 1671951, at *7 (Tex. App.—Dallas Apr. 18, 2024, no pet.) (upholding subsection (O) finding based on father's "complete failure to comply with the material requirements related to substance abuse and psychological assessment and counseling"); *see also In re J.W.*, 645 S.W.3d at 742 (affirming termination of parent's rights when "a reasonable juror could have formed a firm belief or conviction that Father failed to maintain a safe and stable home environment and thus failed to comply with the service plan").

**BEST INTEREST**

We next consider whether sufficient evidence supports the trial court's finding that termination of Mother's parental rights is in the children's best interest. There is a strong presumption that keeping a child with a parent is in a child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, it is equally presumed that "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a). In determining whether a child's parent is willing and able to provide the child with a safe environment, we consider the factors set forth in Texas Family Code section 263.307(b). *See id.* § 263.307(b).

Our best-interest analysis is guided by consideration of the non-exhaustive *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *See id.*; *accord In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013). The Department is not required to prove each factor, and the absence of evidence regarding some of the factors does not preclude the factfinder from reasonably forming a strong conviction that termination is in a child's best interest, particularly if the evidence is undisputed that the parent-child relationship endangered the safety of the child. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Our concern is

whether the evidence, as a whole, is sufficient for the trial court to have formed a strong conviction or belief that termination of the parent-child relationship is in the best interest of the child. *Id.*

The children were two years old at the time of trial. When children are too young to express their desires, the factfinder may consider that the children have bonded with the foster parents, are well cared for by the foster parents, and have spent minimal time with a parent. *In re M.M.*, No. 14-18-00881-CV, 2019 WL 1387964, at *9 (Tex. App.—Houston [14th Dist.] Mar. 28, 2019, no pet.) (mem. op.). Here, the witnesses were in agreement that the children were bonded with Mother. McCada testified that the children also were bonded with their foster placement, and she and Herring testified that the children were well cared for in foster care. The first *Holley* factor is neutral. *See Holley*, 544 S.W.2d at 371.

The other *Holley* factors, however, weigh in favor of termination. As discussed above, competent evidence shows Mother's positive tests results for methamphetamine and heroin. Mother's illegal drug use is relevant to multiple *Holley* factors, including the child's emotional and physical needs now and in the future, the emotional and physical danger to the child now and in the future, Mother's parental abilities, the stability of Mother's home, and the acts or omissions which may indicate an improper parent-child relationship. *See Holley*, 544 S.W.2d at 371–72; *In re J.A.D.*, No. 04-24-00292-CV, 2024 WL 4499195, at *8 (Tex. App.—San Antonio Oct. 16, 2024, no pet.) (mem. op.); *see also* TEX. FAM. CODE ANN. § 263.307(b)(8) (providing as relevant consideration "whether there is a history of substance abuse by the child's family or others who have access to the child's home"). "The factfinder can give great weight to the significant factor of drug-related conduct . . . because drug use can destabilize the home and expose children to physical and emotional harm if not resolved." *In re N.L.R.*, No. 04-23-01020-CV, 2024 WL 1184462, at *3 (Tex. App.—San Antonio Mar. 20, 2024, no pet.) (mem. op.) (citations omitted).

Among other things, "a parent's illegal drug use exposes a child to the possibility that the parent may be impaired or imprisoned." *In re R.W.*, No. 04-21-00025-CV, 2021 WL 2446208, at *3 (Tex. App.—San Antonio Jun. 16, 2021, no pet.) (mem. op.) (citation and brackets omitted).

Methamphetamine and heroin are both Penalty Group 1 substances. TEX. HEALTH & SAFETY CODE ANN. § 481.102(2), (6). Both are "'hard drug[s],' unlike marijuana, for example, and carr[y] greater risk of danger and incarceration." *In re R.A.B.*, No. 08-22-00247-CV, 2023 WL 3672050, at *11 (Tex. App.—El Paso May 25, 2023, pet. denied) (mem. op.); *see* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(2), (6), 481.121; *cf. In re M.A.J.*, 612 S.W.3d 398, 414–16 (Tex. App.—Houston [1st Dist.] 2020, pet denied) (determining narcotics use weighed only slightly in favor of termination when the parent tested positive for amphetamines and methamphetamine only once at the outset of the case but continued to test positive for marijuana throughout). Underscoring the seriousness of Penalty Group 1 substance abuse, the Legislature has specified, for the criminal offense of abandoning or endangering a child, that "a person engaged in conduct that places a child . . . in imminent danger of death, bodily injury, or physical or mental impairment if: . . . the person injected, ingested, inhaled, or otherwise introduced a controlled substance listed in Penalty Group 1 . . . into the human body when the person was not in lawful possession of the substance . . . ." TEX. PEN. CODE ANN. § 22.041(c-1)(3).

In addition to Mother's positive drug tests, Herring testified that Mother "surround[ed] herself with people who engage in drug use." McCada testified that Mother was unable to provide the name of a family member as a possible placement for the children, and Mother withdrew the name of her friend, who she initially proposed, because the friend "wasn't stable herself." *See* TEX. FAM. CODE ANN. § 263.307(b)(13) (providing courts may consider "whether an adequate social support system consisting of an extended family and friends is available to the child.").

Although Mother contended her blood pressure medication could have caused positive test results for methamphetamine, her only excuse for positive heroin results was "exposure." The trial court reasonably could have rejected this excuse as incredible and, regardless, the excuse reflected Mother's poor judgment as to friends and environment. *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (recognizing appellate court defers to factfinder on witness credibility issues); *see also* TEX. FAM. CODE ANN. § 263.307(b)(11) (providing courts may consider "the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time"); *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) ("A trier of fact may measure a parent's future conduct by his past conduct. . . .").

McCada testified that the twins were autistic and required physical and occupational therapy, and G.A.G. additionally required speech therapy. According to both caseworkers, the twins' foster placement was able to meet their needs. The Department's plan was adoption, and it was actively looking for a permanent home for the children. *See In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.) ("Stability and permanence are paramount in the upbringing of children." (citation omitted)); *cf. In re E.C.R.*, 402 S.W.3d at 250 (affirming best interest although there was no evidence child's foster family would adopt him); *In re Z.I.A.R.*, No. 10-16-00039-CV, 2016 WL 4150691, at *6 (Tex. App.—Waco Aug. 3, 2016, no pet.) (mem. op.) ("[T]he best interest of the child may be served by termination so that adoption may occur rather than the impermanent foster-care arrangement that would result if termination did not occur."). In contrast to the stability the Department proposed, McCada testified that Mother had been evicted from her apartment in February 2024, and Herring testified that Mother had not obtained full-time employment, although she held marketable skills. *See* TEX. FAM. CODE ANN. § 263.307(b)(11); *In re J.M.L.T.*, No. 04-19-00136-CV, 2019 WL 3432090, at *3 (Tex. App.—San Antonio Jul. 31,

2019, no pet.) (affirming best-interest finding where, among other things, parents testified they had secured housing and employment by time of trial, but neither parent maintained consistent housing or employment while case was pending).

After viewing all of the evidence in the light most favorable to the trial court's best-interest finding, we conclude that the trial court could have formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interest. *See In re J.F.C.*, 96 S.W.3d at 266. We further conclude that any disputed evidence, viewed in light of the entire record, was not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination was in children's best interest. *See id.* Therefore, we hold the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

## CONCLUSION

The trial court's order of termination is affirmed.[6]

Rebeca C. Martinez, Chief Justice

---

[6] Because we affirm the termination of Mother's parental rights, Mother does not have standing to challenge the trial court's conservatorship determination, which she attempts in her fifth issue. *See* TEX. FAM. CODE ANN. § 161.206(b) ("Except as provided by Section 161.2061 [relevant to relinquishment], an order terminating the parent-child relationship divests the parent and the child of all legal rights and duties with respect to each other, except that the child retains the right to inherit from and through the parent unless the court otherwise provides."); *In re Lambert*, 993 S.W.2d 123, 132 (Tex. App.—San Antonio 1999, orig. proceeding) ("Former parents do not have standing to invoke the trial court's continuing jurisdiction over managing conservatorship issues."); *see also In re C.C.O.*, No. 04-24-00268-CV, 2024 WL 4897188, at *6 (Tex. App.—San Antonio Nov. 27, 2024, no pet. h.) (noting appointment of Department as managing conservator "may be considered a consequence of the termination pursuant to Family Code section 161.207" (citation omitted)). We overrule Mother's fifth issue.